UNITED STATES, Appellee

v

JEFFIE D. MILLER, Specialist Four,
U. S. Army, Appellant

21 USCMA 92, 44 CMR 146

No. 23,985

December 10, 1971

*Captain Terrence Ahern* argued the cause for Appellant, Accused. With him on the brief were *Colonel George J. McCartin, Jr., Major Alan W. Cook*, and *Captain Gary W. Allman.*

*Captain Leon J. Schachter* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway*, and *Captain Richard L. Menson.*

### Opinion of the Court

QUINN, Judge:

The question presented by our grant of review is "whether there was probable cause to conduct a search of the accused at Eglin Air Force Base, Florida." The search led to discovery of four tablets of d-lysergic acid diethylamide (LSD) which, over defense objection, were admitted into evidence at the accused's trial on a charge of possession of the substance, in violation of AR 600–50, paragraph 18.1, August 16, 1969.

1st Battalion, 29th Infantry, 197th Brigade, was stationed at Fort Benning, Georgia. It was commanded by Lieutenant Colonel Johnny J. Johnston. The Battalion provided support troops for the Infantry School's Ranger Company at Eglin Air Force Base, Florida. The accused was a cook with Company B. By order dated February 5, 1970, he and a number of others from Company B were placed on temporary duty, effective February 13, 1970, at the Infantry School as support for Ranger Class Number 8 at the School for a period of approximately twenty-one days. Captain Fletcher C. Phillips, the commanding officer of Company B, was designated "Officer in charge" of the support unit.

On the morning of February 13, two soldiers reported to Colonel Johnston. One of the soldiers, unidentified by name, was known to Colonel Johnston for almost his "entire tour" at Fort Benning, a period of about a year. The Colonel considered the soldier to be a "reputable member . . . of the battalion." On at least two occasions this soldier had furnished information leading to the seizure of prohibited drugs; other similar reports by him were determined by Colonel

Johnston to be "true," but no seizures had been made because the authorities got there "too late." The soldiers told Colonel Johnston that "Chief Miller," whom they described by physical features and as a cook who lived on the third floor of Bravo Company, had in his possession "over a hundred tablets" of LSD in matchboxes. They said that "the night before" Miller left for Eglin Air Force Base, they had seen the tablets in his possession. Miller left Fort Benning on either the 11th or 12th of February. Learning of Miller's possession of one hundred tablets of LSD, Colonel Johnston's "immediate concern" was that Miller was a seller. Under questioning by him, the informants indicated that they did not know whether Miller was a seller, but they did know he was a "user."

Colonel Johnston went immediately to B Company. He conferred with First Sergeant Clark, the senior noncommissioned officer. He was informed that a cook assigned to the company bore the name of Miller; that this person was known as Chief Miller because of his Indian ancestry; that he had the same physical characteristics of the person described as the Chief Miller in the report he had received from the two soldiers; and that he occupied a room on the third floor of the barracks. Since "all the circumstances fit," Colonel Johnston concluded that the Chief Miller of Company B was the Chief Miller described in the report. He reasoned that the LSD had either been left behind in Miller's quarters at Fort Benning or had been taken, in whole or in part, by Miller to Eglin. Accordingly, he "determined to search" both Miller's possessions in his room

**93**

and Miller's person and effects at Eglin.

A search of property identified as belonging to Miller in the room produced no LSD. Thereupon, Colonel Johnston directed that Captain Phillips be instructed to search the accused and his personal effects. A telephone call was made to Phillips to apprise him of Colonel Johnston's order. Pursuant thereto, Captain Phillips had the accused brought to the "sleeping area." He advised him of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, and "explained" that he "was going to search" him for narcotics. The accused "just handed" over a matchbox. The box contained four tablets later identified as LSD.

The proven reliability of at least one of the persons who reported to Colonel Johnston and ■ Colonel Johnston's verification of significant details of the report provide ample support for his determination that there was probable cause to believe the accused had possession of a large quantity of LSD one or two nights earlier. Considering the number of tablets purportedly possessed by the accused and the indications that he was a user, not a pusher, the interval between the time he was seen in possession of the tablets and the time of the report was not so long as to make it unreasonable to conclude that he still possessed many of the tablets on February 13th. Coury v United States, 426 F2d 1354 (CA 6th Cir) (1970); cf. United States v Crow, 19 USCMA 384, 41 CMR 384 (1970).

Appellate defense counsel contend the evidence before Colonel Johnston was insufficient to indicate the place at which the accused was seen in possession of the tablets. They argue that the possession could have been at a place outside Fort Benning and, therefore, there was no justification to search the accused's room on post or his person and effects at Eglin Air Force Base. See United States v Racz, 21 USCMA 24, 44 CMR 78 (1971);

United States v Elwood, 19 USCMA 376, 41 CMR 376 (1970). The place of possession is not specifically mentioned in Colonel Johnston's testimony, but it may fairly be inferred from that testimony that he understood the place of possession was Fort Benning. Since the accused was reportedly a user, not a seller, it was reasonable for Colonel Johnston to conclude that the accused had taken only some of the tablets with him to Eglin because of the relatively short period of time he would be absent from Fort Benning. As the accused had possession of the tablets "the night before" he left for Eglin, it was reasonable to infer that he had left the remainder at Fort Benning. These circumstances impress us as providing a sound and sufficient basis for the Colonel's decision to search both accused's room and his person and possessions at Eglin. True, Captain Phillips had no factual information of his own to justify ■ a search, but he was Colonel Johnston's subordinate and in carrying out the search he was executing Colonel Johnston's order. Compliance with a proper order to search "relayed down the chain of military command, and executed in an orderly manner by military personnel, cannot be termed unreasonable." United States v Best, 76 F Supp 857, 864 (DC Mass) (1948), affirmed, 184 F2d 131 (CA1st Cir) (1950), certiorari denied, 340 US 939, 95 L Ed 677, 71 S Ct 480 (1951). In the circumstances disclosed by the record, Captain Phillips was "entitled to act on the strength" of Colonel Johnston's order. Whiteley v Warden of Wyoming State Penitentiary, 401 US 560, 568, 28 L Ed 2d 306, 91 S Ct 1031 (1971). We conclude, therefore, that the LSD obtained from the accused by Captain Phillips was properly admitted into evidence.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge DARDEN and Senior Judge FERGUSON concur.